29464.    MORGAN *v.* HUTCHESON.

DECIDED JULY 10, 1942.    REHEARING DENIED JULY 23, 1942.

*S. W. Fariss, F. M. Gleason,* for plaintiff.

*Julius Rink, Rosser & Rosser, Shaw & Shaw,* for defendant.

FELTON, J. Mrs. Morgan testified, in substance, as follows: that in 1933 she saw a piece in the paper that Mr. Hutcheson had gotten a claim through for a man; that she went to see him and he told her he had learned the claim was inactive; that later he wrote her to come to see him, and on October 21, 1934, in Mr.

Hutcheson's office, he helped her fill out the claim; that she understood Mr. Hutcheson was a practicing attorney, and that he informed her that if her claim was not paid he would bring suit to enforce it; that he told her he was allowed to collect ten per cent. of the amount collected; that she did not agree at that time to pay him that, but later, in response to a letter, she went back to his office in December, 1934, at which time he informed her that he wanted a written contract and that he was allowed an extra five per cent. for the work he had done, making the total amount fifteen per cent.; that they argued about it and Hutcheson agreed to take twelve and one half per cent. provided no lawsuits were filed; that following that conversation the written contract was entered into at the suggestion of Hutcheson; that the contract was never rescinded and she paid Hutcheson under the terms of that contract; that the check which she gave Hutcheson represented 12½ per cent. of the money she received from the Government, less $80 which was paid to her uncle as administrator of her husband's estate which represented the costs of the bond; that the reason the $80 was deducted from Hutcheson's fee was that she was not going to accept the check from the administrator, but was going to litigate over the amounts charged her by the administrator, and Hutcheson agreed that the $80 be taken from his fee; that Hutcheson did not pay the expenses to Indiana; that Hutcheson, her husband, and she drove to Indiana in her husband's car; that the money could not be paid until 1935, and in October, 1935, they went to Knoxville, collected the money, and she paid the fee to Hutcheson the following day in Chattanooga, Tennessee; that Hutcheson stayed with her until his fee was paid; that she never agreed to give Hutcheson any money, and no such conversation as is alleged in his answer ever took place; that she learned in 1938 that at the time the contract with Hutcheson was made the claim for the insurance had already been allowed by the Government; that so far as she knew Hutcheson's services in the collection of the insurance were nothing; Hutcheson did nothing save file the claim, or filled out the blank printed by the Government; that no suit of any kind was ever filed in connection with the claim for insurance; that if there had been no contract, or if it had been rescinded, Hutcheson could not reasonably have earned the amount paid him had he done everything which he did do in connection with the

claim; that Hutcheson did not mention employing a lawyer, but always said he was a lawyer himself and said he went through the Berry School of Law; that she believed that and acted on it; that Hutcheson had the usual equipment of a lawyer in his office, a desk, chair, typewriter and books; that he represented himself to be a lawyer in Indiana; that she first learned that the claim had been allowed before the contract was made when men from the Federal Bureau of Investigation came to interview her; that it was after a decision by the Supreme Court allowing veterans to collect on their insurance that Hutcheson aided her in filing her claim; that the decision was handed down in September, 1934, and she learned of it in October when he came to her and asked her to file a claim for the insurance; that Hutcheson told her he could get any information out of Washington through his American Legion; that she learned that $10 was all that could be charged for the assistance in filing the claim; that she got a letter from the Veterans Bureau that the act under which this claim was paid was passed by Congress and that the claim had been passed by the insurance claims counsel and nothing was done by anybody; that Hutcheson wanted to go to Indiana with her because he thought she would be appointed administrator and he could get his money quickly, and he told her that was the reason he wanted to go; that he said he wanted to buy a tract of land and insisted that she pay him the money.

Being cross-examined by Mr. Julius Rink, Mrs. Morgan testified substantially: that her husband did not file the original application to have the insurance paid, and that, according to a letter she had from Mr. Breining, there was never an application filed; that her husband left it with them, and nothing was ever done about it; that during the lifetime of her husband she did not try to interest Mr. Jim Watson of Indiana in the prosecution of the claim, and did not so inform Mr. Hutcheson; that the claim was before the insurance division and then went before the claims counsel, and was allowed; that she went to see Frank Gleason for the purpose of trying to get him to help on the claim, but he said he did not handle that kind of cases; that Mr. McNahon, a meat salesman, carried her in his car to see Mr. Hutcheson; that according to a letter she had from the Veterans Bureau Mr. Hutcheson did nothing toward the collection of the claim; that she asked in 1924,

after the death of her husband, if there was any insurance due on the policy, and she was notified that her husband was not considered totally disabled and the claim was denied; that nothing was ever done about it until it went to the claims counsel; that Congressman McReynolds investigated after the claim was allowed, and found that Hutcheson had nothing to do with the allowance; that she did not know about it if Hutcheson wrote her in October, 1934, advising that the claim had been allowed, or whether she had been consulting and advising with him and following his directions since February, 1933; that she learned that the claim was allowed on December 7, 1934, some two months after it was allowed, when Hutcheson called her by long distance; that she did not advise Hutcheson that she was penniless; that her husband at that time had an office in Knoxville and Chattanooga, Tennessee; that Hutcheson went on his own accord to Indiana to collect the money; that she was not served with a copy of a notice to produce the letter written by Hutcheson to her, advising that he had done all he could in the case and that he could not charge anything for his services and that she would have to go on and look out for it herself; that she never received any such letter; that she did not go to the office of Hutcheson and berate him for letting her down after receiving such a letter; that she did not make any such statement in the presence of Ed Puryear; that she never discussed the letter in the presence of Mr. Rink; that she did not bring any such letter to the office of Hutcheson and in the presence of W. A. Pack, J. Bryan, and Darnell Keys say anything about Hutcheson throwing her down; that she never discussed this case in the presence of any one; that Keys was not in the office when she presented Hutcheson with the check, but was downstairs; that Hutcheson knew how much the check was for, but she did not know whether he opened it or not, but that he stated he did not want his creditors to know how much it was; that she did not give the check to Hutcheson in the presence of Keys and make the statement that she had never enjoyed giving any one anything so much as she did giving him this, because she never gave anybody anything in her life because she did not have money to give away; that she did not say she enjoyed giving him the check for the work done for her; that she was served with notice to produce the letter from Hutcheson rescinding the contract but she had never received such a letter; that

Hutcheson never allowed her husband to sit in on their conferences for he said that it might prove embarrassing to her husband; that she never went to the office of Rink in the company of Hutcheson to confer about the contract but that she did go to Rink's office to discuss his doing some surveying for her, but that she did not go and ask why she could not make such a contract; that she did not ask that question and receive the reply from Rink that it would not be worth the paper it was written on; that she did not say that there was no reason why she should not give Hutcheson a fee and she was not told that it was her money and if she felt like it she could throw it in the creek; that she never discussed the contract with Rink in his office; that according to the letter she received from the Government Hutcheson did nothing at all; that if he did anything she did not know it but that he claimed he did something; that she gave Hutcheson all the information placed on the blanks, but Hutcheson did get some affidavits in Indiana; that she did not know how many times Hutcheson prepared affidavits and went to see Judge Tarver and Senator Russell to get the case reopened, but she would not say that he did not go to Atlanta and Dalton to see Judge Tarver and Senator Russell, but to her knowledge, he never went anywhere; that she supposed Hutcheson made the preparation for the bond in Indiana because when she got there there was nothing for her to do; Hutcheson did that service for her, but it was his idea so he could get the money real quick; that Hutcheson thought that if they went to Indiana she could be appointed administratrix and they could get the money.

Hutcheson testified substantially: that he first met Mrs. Morgan on April 8, 1933; that he had had some previous correspondence with her; that the first letter he had from her was while he was in the legislature in which she stated that she had been to see him in connection with a claim against the Government; that he wrote her he would be at home in March and she came to his house in April, and that at that time she told him she had been working on the claim for several years through the Veterans Administration and asked his assistance; that at that time he insisted that she take the claim to some one else on account of the work that had piled up during his stay in the legislature; that he was working on several claims at that time by virtue of the fact that he was service officer of the Ross-Graham Post 87 of the American Legion, and in that

capacity was working for veterans all over northwest Georgia; that he told Mrs. Morgan to bring her file to him and he would see what he could do for her; that she named several people with whom she had been in contact regarding the claim for insurance and that he, Hutcheson, had been highly recommended as being successful in that kind of work; that he told her not to get excited, but to send him the file so that he could study it; that she asked what he would charge to handle the claim and that he informed her that he could not make a charge for it; that she then asked what was the usual charge by lawyers for the collection of notes and he informed her that the per cent. was usually ten, but that he was not an attorney, and that if he were he could not charge her; that she then said she would give him 10 per cent. to collect the claim; that he told her he could not charge her a dime; that she sent the file to him and from that time came to see him at frequent intervals; that he discovered that her husband had been in a hospital in Kentucky and he wrote letters with reference to her husband; that he took a trip to Dalton to see Judge Tarver and a trip to Atlanta to see Senator Russell about this and other claims; that he took the position with Judge Tarver and Senator Russell that the economy act was void so far as insurance was concerned on this claim; that he then took the matter up with the Veterans Administration which sent him form No. 541 which is never mailed out until after the award is made; that Mrs. Morgan gave him the information and he prepared this form; that he received word that the claim was allowed about October 24 or 25, 1934; that the original of the letter was turned over to Mrs. Morgan in his office; that during the interval between the time Mrs. Morgan first visited him and the notice of the award was received Mrs. Morgan visited his office many times; that he had a file in connection with this claim which had disappeared from his office, that some of the letters which were introduced by the plaintiff were in his original file; that the contract was made in his office; that when the notice of the award was received, it developed that the estate of the deceased husband would have to be administered in Indiana, and Mrs. Morgan stated that she was not able financially to pay the expenses; that he told her there was nothing he could do for her in Indiana; that she said he could borrow the money and that she would pay it back out of the award when she collected the money; that he finally agreed to bor-

row the money to pay the expenses upon the condition that she re-pay it out of the money from the claim; that she agreed to do this and also stated that she was going to pay him an additional 5 per cent.; that he told her again that he could not charge her for his services; that this conversation was had in the presence of two people, now both dead; that they asked these two people, Mr. Glenn and Judge Henry, about drawing up a contract and they replied it would be all right to enter into the contract provided it was un-derstood that he was not acting as her lawyer; that it was then agreed that he would get 15 per cent. if no suit was filed and 12½ per cent. if suit was filed; that two copies of this contract were made; that he turned his copy of the contract over to the intelli-gence service of the United States Government at their request; that he notified Mrs. Morgan that he was rescinding the contract; that he wrote her that he had been advised that there could be no regular contract entered into for these services and for that reason he was rescinding the contract; that the copy of the letter pre-sented to him was a copy of the original letter written to Mrs. Morgan rescinding the contract; that he addressed that letter to Mrs. Morgan and deposited it in the mail addressed to Mrs. Morgan at Rossville, Georgia; that Mrs. Morgan went to his office after she had received the letter rescinding the contract; that she came in with the letter in her hand and stated that she wanted to know what the letter meant, and said, "You are not going to throw me down when I need you most;" that E. A. Puryear and J. Bryan were in there at that time; that he told her he was going to do exactly what he said he would do, provide the funds for the trip to Indiana and make the trip with her; that she then went to Rink's office and asked why she could not enter into such a contract; that Rink advised her that no lawyer could enter into a contract with the Government for fees in connection with the collection of claims of this kind because of a regulation forbidding it; that Rink told her that Hutcheson was not a lawyer and could not charge for services rendered, and that the Government would not recog-nize such a contract; that she then replied that it was her money to do with as she pleased, in reply to which Rink told her that she might throw it into the river if she cared to; that the letter was written to Mrs. Morgan on December 4, 1934, and she and Hutche-son left for Indiana on January 1, 1935, at which time an admin-

istrator of the estate of Mrs. Moore's husband had not been appointed; that the appointment of an administrator was the purpose of the trip to Indiana; that he borrowed the money to make that trip and to defray the expenses of Mrs. Morgan and her husband and himself; that he got the money from W. E. McKeown and Neil Andrews; that he turned over to Mrs. Morgan $65 or $70, and the trip was made in her husband's automobile; that the expenses for gasoline were paid out of the money furnished by him to Mrs. Morgan; that when they arrived in Indiana he looked after the appointment of an administrator, and Mrs. Morgan chose her uncle, Clarence Gaumer, as such administrator; that he, Hutcheson, looked after the appointment and arranged about the bond with the U. S. Fidelity & Guaranty Company; that after some correspondence with various persons he learned that the money had been sent to Knoxville, Tennessee; that Mrs. Morgan wanted to know if he would pay the expenses to Knoxville, and he informed her he could not go, but at her insistence he borrowed $35 and went with her to Knoxville; that he actually furnished $60 for the trip to Indiana and $30 for the trip to Knoxville; that he paid all of the long-distance 'phone calls and postage in connection with the collection of the claim; that the only time he spent the night at Mrs. Morgan's home was when they returned from Indiana, and not when the money was paid; that when he was paid he did not ask her for a check; that she said, "How much do I owe you?" that he replied, "Mrs. Morgan, you know how much money I have advanced you. I can't charge you for any service that I have rendered you, but I do expect you to pay back the money that I have advanced for expenses in making these trips;" that he informed her that he had assisted veterans and families of veterans in the collection of $160,000 on claims and had never charged a dime; that she replied that she would not let him do all the work he had done without paying for it, and gave him the check for $1537.50; that she stated he might think it was hard for her to pay the money but that she had never enjoyed giving any one anything as much as she enjoyed giving this to him, and that she wanted him to receive it as a gift; that after this the first time he heard her complain of having paid him was in 1938; that he had seen her since the issuance of the check and she had made no complaint; that after he wrote the letter rescinding the contract she went to his office and in the pres-

ence of W. A. Pack and J. L. Rowland asked why he had let her down; that he stated to her a number of times that he was not a lawyer, and did not make the statement to any one in Indiana that he was a lawyer.

On cross-examination Hutcheson testified substantially: that the letters handed to him by counsel were turned over to Mrs. Morgan by him, but they were not part of the file that disappeared from his office; that what he did in connection with the claim was to write numerous letters to Kentucky, Indiana, and Washington, fill out forms, and confer with Mrs. Morgan some fifty times in his office; that he was to collect a fee under the contract, but the contract was rescinded; the copy of the letter rescinding the contract was not lost with the rest of his file on this claim because it was in a brief case with two or three other letters; that the contract was drawn up after both he and Mrs. Morgan knew that she was going to get the money; that he entered into a contract for handling the estate for her; that the contract was rescinded because he was advised by an attorney that the contract was no good; that he does now testify that the contract entered into with Mrs. Morgan was for services rendered to Mr. Moore's estate rather than for services rendered in the collection of the insurance claim; that the check received from Mrs. Morgan was not paid under the terms of the contract but was a gift; that he stayed with Mrs. Morgan on the trip to Indiana, and that Mrs. Morgan bought the gas on that trip and on the trip to Knoxville, but that the gasoline was bought with money he had advanced.

J. L. Rowland testified for the defendant, substantially: that he heard a discussion between Mrs. Morgan and Mr. Hutcheson with reference to the payment of Hutcheson; that Mrs. Morgan told Hutcheson that he would be well taken care of; that he heard a conversation between Mrs. Morgan and Hutcheson in which Hutcheson told her he never charged for aiding veterans in the collection of insurance claims and also that he, Hutcheson, was not a lawyer; that the latter statement was made many times; that he heard Hutcheson state to Mrs. Morgan that he was prohibited from charging her a fee for his assistance; that he had lived in Walker County seventy years, and had known Hutcheson since 1924, and that since he had known him had never known him to hold himself out as a lawyer or make an attempt to practice law.

nor had he heard Hutcheson intimate that he was a lawyer; that he had never heard Hutcheson demand any fee of Mrs. Morgan but in the conversations he heard had always heard him tell her that he was not allowed to charge a fee. On cross-examination Rowland testified in substance that he did not know at the time of the conversations testified about that Hutcheson could not charge a fee, that he had entered into a written contract whereby he was charging her a fee.

Darnell Keys testified for the defendant, substantially: that he had known Hutcheson six or seven years in 1935; that he knew Hutcheson was helping veterans and beneficiaries in matters before the Veterans Bureau; that he remembered seeing Hutcheson in Chattanooga; that he went with Hutcheson to the office of Mrs. Morgan and that Mr. Morgan came in as they were going to leave; that on that occasion Hutcheson told Mrs. Morgan that she knew how much money he had let her have for expenses; that Hutcheson never told Mrs. Morgan in his presence that she owed anything for fees; that Mrs. Morgan did not write the check in his presence, but handed it to Hutcheson; that Hutcheson did not look at the inside of the check until he reached the street; that when the check was given Mrs. Morgan said, "Hutch, that is a nice present;" that she would be glad to give him twice that if she could; that he is not related to Hutcheson and not interested in the outcome of the case. On cross-examination Keys testified that the reason he came from Hahira, Georgia, his home, 320 miles to appear as a witness, was that he was subpœnaed and was present at the last term of court; that so far as he knew nobody was paying his expenses; that he was staying with Mr. Hendrix and Mr. Millard; that Hutcheson stayed with Millard; that though he spent the night in the same house with Hutcheson he had not discussed the case with him since the day before; that he did not know whether the check was creased when it was handed by Mrs. Morgan to Hutcheson, but did know it was folded over; that the reason he was in Chattanooga on that occasion was that he had business there, but not with Mrs. Morgan; that he did testify that he heard Mrs. Morgan ask Hutcheson how much she owed him; that Hutcheson accepted the money as a gift, and was told by Mrs. Morgan that it was a gift in the presence and hearing of the witness.

W. A. Pack testified for the defendant, substantially: that he

lived in West LaFayette and had known Hutcheson for about seventeen years; that he had heard conversations between Mrs. Morgan and Hutcheson in Hutcheson's and Mr. Glenn's offices a number of times; that the conversations concerned a claim Mrs. Morgan had; that they talked about a contract; that Hutcheson told her in effect that he was not admitted to the bar; that on one occasion when Mrs. Morgan came into Hutcheson's office she seemed pretty angry and had a paper in her hand, and talked to Hutcheson about that paper; that the question of fees was raised several times and each time he said that he was not allowed to charge her a fee; that he heard Hutcheson tell Mrs. Morgan that he was not a lawyer in Georgia or Indiana; that he heard Mrs. Morgan ask Hutcheson to finance the trip to Indiana and that she would reimburse him.

Ed Puryear testified for the defendant, substantially: that he had lived in Walker County forty-five years and had known Hutcheson eighteen years; that he had seen Mrs. Morgan in Hutcheson's office three or four times and had heard a conversation between them concerning an insurance claim; that she wanted him to go to Indiana in connection with the claim to collect a large sum of money; that she wanted him to go because he had had experience in this type of case, and she thought he could do it better than any one else; that she told Hutcheson she was going to make him proud of what she was going to give him, but this was the only mention of any fee that he heard; that Hutcheson told her he was not an attorney and could not go as her legal representative; that it seemed to him that she came to the office one day with a letter in her hand in which Mr. Hutcheson had told her he could not handle the case, and she still wanted him to handle it; that she told Hutcheson she had tried to get other men to handle it but none of them could do it as well as he could, and she wanted him to go on with it, and Hutcheson told her he would do the best he could; that in none of these conversations did he hear Hutcheson tell her that he was demanding a fee for his services; that he knows that Hutcheson borrowed some money for the purpose of making the trip to Indiana; that he helped organize the Legion Post and had been commander twice. On cross-examination Puryear testified that the happenings testified to by him were in 1934; that he thinks that at that time he was commander of the Legion Post and

Hutcheson was service officer; that he and Hutcheson discussed claims for war-risk insurance some few times; that the Legion Post kept in close touch with the claims of veterans and their beneficiaries; that they did not receive any confidential information concerning the claims.

W. M. Leigh testified for the defendant, that he had lived in Walker County for forty-five years and had known Hutcheson for eighteen years and Mrs. Morgan for ten years; that he referred Mrs. Morgan to Hutcheson and went with her to see him.

Julius Rink testified for the defendant that he was a practicing attorney and knew the parties to this suit; that Hutcheson and Mrs. Morgan came to his office on one particular occasion and asked about a contract for fees in the matter of the insurance claim; that he instructed them that the Federal Government would not recognize a contract for such services, and if they made a contract they might get into difficulty about it; that Mrs. Morgan told him it was her money and she could do what she wanted to with it, and he told her she could throw it in the creek if she wanted to; that at that time they also discussed how the estate would be administered in Indiana; that either Mr. or Mrs. Morgan came to his office relatively to a survey, and he made one for them; that the survey was made in 1935 and the conversation just testified to took place in December, 1934. On cross-examination Rink testified, that there was no doubt that Mrs. Morgan and Hutcheson were in his office to see him about the contract; that he often wonders why people come to see him, but possibly Hutcheson had a fair opinion of his legal ability; that he knew Hutcheson spent about half his time handling claims for veterans; that the sum of $1500 that Hutcheson got as a gift or fee was a reasonable sum for his services; that if Hutcheson made a contract and accepted the money under the terms of the contract it might be illegal.

B. G. Morgan testified for the plaintiff, that he was the husband of the plaintiff; that he lived at Rossville and had lived there for ten years; that he remembered in 1933 or 1934 coming up to talk to Hutcheson; that he came with his wife and she wanted to talk about a war-risk policy on the life of her former husband; that they went to Hutcheson's law office; that the discussions between his wife and Hutcheson were carried on in private; that he did not sit in on the conferences: that he saw the contract after it was

made; that he went with them to Indiana and they went in his car and paid the expenses; that they stopped with his wife's family in Indiana; that he made the trip with Hutcheson and his wife to Knoxville, and no money was borrowed from Hutcheson for that trip; that at that time he was able to finance his wife and himself in making the trips to Indiana and Tennessee; that the purpose of the trip to Indiana was to get the money, but the administration of an estate was involved up there; that his wife's uncle was clerk of the probate court in Indiana and he handled the administration; that the bonding company turned the money over to his wife; that he does not recall whether Hutcheson stayed the night at their home the night before the money was paid to Hutcheson; that there was no man named Keys at the office at the time the check was given Hutcheson; that witness figured the amount of money going to Hutcheson and tried to figure according to the contract between Hutcheson and his wife; that the $80 bond premium came up at that time; that Hutcheson agreed to pay the bonding company and accept 12½ per cent. if Mrs. Morgan would go ahead and accept the money, which she did; that after he had figured the amount Mrs. Morgan wrote the check and gave it to Hutcheson in his presence, and the check was paid in accordance with the terms of the contract; that no one else was present and to the best of his knowledge no man by the name of Keys ever came to his office in Chattanooga.

On cross-examination Morgan testified that he was married to the plaintiff in 1924, about a year and a half after her husband's death; that on the trips to see Hutcheson with his wife he never heard a conversation between them with reference to the contract or the trip to Indiana; that he paid the gas and oil expenses to Indiana, and did not know whether his wife had any funds or not; that he had been separated from his former wife but had not been sued for alimony; that he did make the trip to Indiana; that he did say, and he was sure, that he did not see any other man come into the office there in Chattanooga; that it is not true that instead of deducting $80 for the bond premium from the amount due Hutcheson he added $80 for money advanced for the trip to Indiana and Knoxville.

Hutcheson, recalled, testified that Morgan did not go to Indiana with Mrs. Morgan and him, but that he stopped in Louisville, and

that Morgan stated that he could not go to Indiana because there was an action pending in Indiana against him for alimony, that he was delinquent in the payments to his former wife, and he did not want to get back within the jurisdiction of the Indiana courts. On cross-examination Hutcheson testified, that the reason he did not tell about the alimony action when he first testified was that he was not asked about it; that Morgan said he would stay in Louisville until Mrs. Morgan got to Indiana and made arrangements for a place for him to stay; that the next day Morgan came on to Indiana and stayed with Mrs. Morgan's uncle; that he did not stop with the uncle but with friends of Mrs. Morgan's; that the trip from Louisville to Indiana was made by train, and the car was left in Louisville with Morgan; that he made but one trip to Indiana, and that Mrs. Morgan was along.

Mrs. Morgan, recalled, testified, that she heard what Hutcheson testified about her husband stopping in Louisville and that it was not so, but it was true that by driving all night, with her husband driving, they drove straight through to Indiana; that a suit had been brought against the husband for alimony and it was discussed on the way up but there was no charge or anything pending against him at that time; that she arranged for a place for Hutcheson to stay.

The following letter was introduced by the defendant:
"Dear Mrs. Morgan: Re: Moore case.

"I wish to say that I am writing you for the purpose of stating that I will try to be ready to go to Indianapolis with you and your husband on the morning of the first if you still insist on me going while I am still of the opinion that I can not do a great deal for you by going but if you think I should go I will try to be ready and if I do not see you before that time I will let you know where to meet me in Rossville on the first. I also wish to call your attention to the fact that I can not make a charge against you for my services and that for me to make a charge would subject me to a heavy sentence and fine as the Federal law specifically provides that to make a charge of more than ten dollars one is subject to heavy penalty and since I have never charged any one for services of this nature I make no charge against you and therefore wish to say as Mr. Rink advised you when you were last down here that the contract or the attempted contract or agreement that we

made is a nullity by Federal statute and you need not consider that you owe me for the reason that no contract you might make to pay money out of this fund could be collected except that you just voluntarily live up to the contract or your agreement and therefore I make no charge as a fee for services rendered you but you may rest assured that I shall do everything for you that I can the same as if you were paying me as much as half you recover.

"Wishing for you and Mr. Morgan a big '35, I am,

"Your friend, John M. Hutcheson.

"P. S. If I do not see you before the first I will drop you a card where and what time to meet me. J. M. H."

It is not deemed necessary to set forth the other documentary evidence.

■ Assuming for the sake of argument that the contract was for fees for services for assistance in the preparation and execution of necessary papers in an application to the Veterans Bureau, and did not include any services not related thereto, the action is predicated on the theory that all of the money paid to the defendant was paid under the contract for prohibited charges (with the exception of $10). It is plain from the evidence that the jury was authorized to find that the money was not paid under the contract, and the verdict was authorized on the theory on which the case was tried. Conceding that if the money was presented as a gift to the defendant, for the purpose of compensating him for services for which he could charge but $10, and for service in connection with the administration of Mr. Moore's estate, against a charge for which there is no statutory prohibition, and that an action would lie against the defendant to recover that part of the gift which related to the prohibited charges, there was no evidence as to the respective values of the alleged services, and a finding by the jury that the payment of the money was a gift and not under the contract demanded a finding for the defendant. This answers the contention that the court erred in charging the jury that if the defendant was paid the money as a gift and not under the contract he would be entitled to a verdict. Even if the defendant had rendered no services at all, that is, if he had done nothing in support of the claim before the Veterans Bureau, and had done everything else he did, not as a service to Mrs. Morgan, but to hurry the payment of the money, if the money was paid to cover

both these phases of his activity there was no criterion by which the jury could separate the two and render a verdict for the part of the money paid for the alleged services for which no charge could be made, and there was no exception to the charge in respect to this aspect of the case.

The act of Congress, 38 U. S. C. A. § 551, does not cover any charges except those for services in connection with the papers filed with the Veterans Bureau. · No cases cited are to the contrary. For instance Hines v. Lowrey, 305 U. S. 85 (59 Sup. Ct. 31, 83 L. ed. 56), simply holds that a State court can not allow a larger fee for the services described in the act. It does not hold that there may not be a charge for other services. The facts in this case do not show any activity on the part of Hutcheson with reference to any matter which it would have been beyond the right of a citizen to charge for without being licensed to practice law.

■ Error is assigned on the following instruction to the jury: "Now if you find from a consideration of the testimony that there is a conflict, or conflicts, in the testimony of the witnesses, it becomes your duty to reconcile that conflict if you can without imputing perjury to any witness, but if you can not reconcile such conflict, if any, it then becomes your duty to weigh the testimony of each witness and determine what credibility and weight you will give to the testimony of each and every witness." Such a charge was not error even though the judge also charged: "While you are considering the testimony and evidence in the case; now the testimony is what the witnesses testify, and there is no other evidence in the case of a documentary nature, and that is why I use the words testimony and evidence." There was nothing in any of the documentary evidence which would have aided the jury in reconciling the conflict in the testimony of the witnesses, or which would have aided the jury in determining which witness testified truthfully and which one testified falsely. The complaint of this charge sets out all of the plaintiff's documentary evidence and does not point out what part of it was relevant on the question. The court is unable to find any.

■ It was not error for the court to charge as follows: "Now the defendant files his answer and in this answer he denies each and every allegation in the petition which would authorize the plaintiff to recover any amount of money from him." This charge

amounted to no more than stating the contentions of the defendant.

█ The other charges complained of were not erroneous for any reason assigned. The court did not err in overruling the motion for new trial.

*Judgment affirmed. Stephens, P. J., and Sutton, J., concur.*